Filed 11/25/24  Bonzell v. Retirement Capital Strategies CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| FRANK BONZELL et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> RETIREMENT CAPITAL STRATEGIES, INC., <br><br> Defendant and Appellant. | H052392 <br> (Santa Clara County <br> Super. Ct. No. 24CV433722) |

Frank Bonzell and Carol Bonzell, individually and as trustees of the Bonzell 1996 Living Trust, filed a complaint against their financial, retirement planning, and investment advisor, Retirement Capital Strategies, Inc. (RCS), alleging elder financial abuse, breach of fiduciary duty, negligence, and breach of contract.  RCS filed a petition for an order compelling arbitration pursuant to the arbitration provision in the investment advisory agreement signed by the Bonzells and RCS in 2018 (2018 IAA).

The trial court denied RCS's petition on the basis that the arbitration provision was procedurally and substantively unconscionable, and RCS has appealed that decision. For the reasons set forth below, we affirm the trial court's order.

# I. FACTS AND PROCEDURAL BACKGROUND[1]

*A. Facts*

RCS is a financial, retirement planning, and investment advisor that manages the Bonzells' retirement savings. The Bonzells have been clients of RCS and its predecessor for approximately 30 years, since the early 1990s. The Bonzells have worked with RCS's chief executive officer, Thomas Vaughan, for about 20 years, since approximately 2005.

In 1996, the Bonzells opened a brokerage account with LPL Financial LLC, RCS's managed platform. The arbitration provision in LPL Financial LLC's brokerage account application and agreement stated that arbitration would be governed by "the rules, then in effect of the Financial Industry Regulatory Authority" (FINRA). The provision did not allow RCS to seek non-arbitral remedies in the event of the client's nonpayment of RCS's fees.

In 2010, RCS became registered with the United States Securities and Exchange Commission, which required all RCS's existing clients "to switch from LPL Financial LLC's managed retail platform to the LPL Financial RIA managed platform." To effectuate this conversion, on or about January 21, 2010, RCS sent all of their clients LPL Financial LLC change forms and an investment advisory agreement (2010 IAA) to sign, together with additional informational materials. Vaughan declared in the trial court that "[c]ompleting these forms were [*sic*] optional for all clients. Those clients who did not

---

[1] We take these facts from the complaint and the parties' filings submitted in the trial court in connection with RCS's petition. "We recite the essential relevant facts 'in the manner most favorable to the judgment, resolving all conflicts and drawing all inferences in favor of respondent.'" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1233, fn. 2; *Haydon v. Elegance at Dublin* (2023) 97 Cal.App.5th 1280, 1287 (*Haydon*).) We describe conflicting evidence only as relevant to RCS's contention that there is insufficient evidence of procedural and/or substantive unconscionability in the 2018 IAA arbitration provision.

complete the forms simply remained under LPL's retail platform."[2]  (Italics omitted.)
The first page of the 2010 IAA indicates that the Bonzells signed the agreement on
January 23, 2010.[3]

Pursuant to the 2010 IAA, the Bonzells appointed RCS as their investment advisor
and authorized RCS to invest, reinvest, and manage the Bonzells' funds on their behalf.
The arbitration provision in the 2010 IAA provided that the client and RCS agreed to
submit any dispute pertaining to RCS's services under the agreement "to arbitration in
accordance with the auspices and rules of the American Arbitration Association
('AAA')," but it did not identify the applicable American Arbitration Association (AAA)
rules.  The 2010 IAA in the record does not include a copy of the applicable AAA rules.
The 2010 IAA arbitration provision also granted RCS the right to pursue non-arbitral
remedies "in the specific event of non-payment of any portion of [RCS's fees] pursuant
to paragraph 2" of the 2010 IAA.

In 2018, RCS changed custodians (financial institutions) from LPL Financial LLC
to TD Ameritrade.  RCS characterized the transition as "optional for all clients," and
declared in the trial court that some clients decided to stay with LPL Financial LLC.[4]  At
that time, the Bonzells had approximately $1 million in retirement savings, which RCS
managed for them.  On May 23, 2018, the Bonzells met with one or more RCS
representatives.  They discussed, among other matters, "the impending move to

---

[2] Neither Vaughan nor RCS explains the discrepancy between Vaughan's
statements that RCS's registration with the SEC "required all existing advisory
clients/accounts to switch" platforms and executing the account change forms and that
the 2010 IAA to facilitate the conversion was "optional."  (Italics omitted.)  The record
does not contain the "letter and email" RCS sent to all its clients announcing the change.
[3] It appears that the Bonzells inverted the date and month on the form, as it reads
"made this 1 day of 23, 2010," with the "1," "23," and "10" filled in by hand.  We
construe the handwritten numbers to mean the Bonzells signed the agreement on January
23, 2010.
[4] It is not clear from the record or the briefing whether clients who decided to stay
with LPL Financial LLC were able to retain RCS as their investment advisor.

TD[Ameritrade]," the Bonzells' portfolio performance, and the market outlook. RCS's notes from the meeting do not memorialize or otherwise indicate which aspects of the transition to TD Ameritrade the parties discussed, nor do they reference a discussion of any agreements. Frank Bonzell did not recall RCS explaining any part of the 2018 IAA to him, including the arbitration provision.

Around June 18, 2018, RCS mailed to all of its existing clients, including the Bonzells, TD Ameritrade "[t]ransition packets" (which included the TD Ameritrade client agreement and TD Ameritrade personal trust account application), RCS's 2018 IAA, and brochures. Although Frank Bonzell declared in the trial court that he did not recall seeing the 2018 IAA before his counsel provided a copy to him and did not recall signing it, the signature blocks on the TD Ameritrade documents and 2018 IAA indicate the Bonzells signed the documents on June 18 and June 19, 2018.

The documents from RCS's 2018 mailing that appear in the record do not indicate whether RCS's clients were obligated to sign them to retain RCS's services. Frank Bonzell declared that he and Carol did not want to move their retirement accounts to another financial advisor "[b]ecause RCS had managed all of [their] retirement savings for many years," so "as a practical matter," he would have felt like he "did not really have any choice" but to sign the 2018 IAA.

The TD Ameritrade documents sent by RCS in June 2018 that appear in the record, including the application, account transfer form, move money advisor authorization, and client agreement, comprise 26 pages. The arbitration provision in TD Ameritrade's client agreement states that any disputes between the parties "arising out of or relating to this [a]greement, our relationship, any services provided by you, or the use of the [s]ervices . . . shall be arbitrated and conducted" pursuant to FINRA's arbitration rules. The TD Ameritrade client agreement's arbitration provision sets forth mutual obligations and rights and does not carve out any rights unique to one party over another.

4

The 2018 IAA (drafted by RCS) is six pages long and appears to be a preprinted form with the Bonzells' names typed on a line for their names. It allows the client to fill in the date of the agreement and select the services RCS would perform (two options) and the payment schedule for RCS's services (three options). The agreement uses the term "negotiable" in two places, both located in paragraph No. 3: once to indicate that RCS's stand-alone financial and retirement planning consultation services "fees are negotiable" and once to note that "[f]ees are generally negotiable in the sole discretion of [RCS]."[5] In addition to the signature blocks at the end of the agreement, the 2018 IAA requests that the client initial under the sentence regarding RCS's discretion with respect to the negotiability of its fees.

By signing the 2018 IAA, the Bonzells appointed RCS as their advisor for both financial and retirement planning and investment management services. The 2018 IAA "supersede[d] and replace[d], in its entirety, all previous investment advisory agreement(s) between" RCS and the Bonzells, including the 2010 IAA.

The arbitration provision in the 2018 IAA is substantively the same as the one in the 2010 IAA. The 2018 IAA arbitration provision is set forth on the fourth page of the six-page agreement, in a separate paragraph (paragraph No. 14), and marked "Arbitration." (Underscoring omitted.) The provision states: "Subject to the conditions and exceptions noted below, and to the extent not inconsistent with applicable law, in the event of any dispute pertaining to [RCS]'s services under this [a]greement that cannot be resolved by mediation, both [RCS] and [c]lient agree to submit the dispute to arbitration in accordance with the auspices and rules of the American Arbitration Association

---

[5] Paragraph No. 21 of the 2018 IAA provides that RCS "may amend [the a]greement upon written notification to the [client]. Unless the [client] notifies [RCS] to the contrary, in writing, the amendment shall become effective thirty (30) days from the date of mailing." (Boldface omitted.) Neither party mentions this provision in their briefing, and the trial court did not reference it in its order denying the motion to compel arbitration.

5

('AAA'), provided that the AAA accepts jurisdiction. [RCS] and [c]lient understand that such arbitration shall be final and binding, and that by agreeing to arbitration, both [RCS] and [c]lient are waiving their respective rights to seek remedies in court, including the right to a jury trial. Client acknowledges that [c]lient has had a reasonable opportunity to review and consider this arbitration provision prior to the execution of this [a]greement. Client acknowledges and agrees that in the specific event of non-payment of any portion of [RCS's fees] pursuant to paragraph [No.] 2[6] of this [a]greement, [RCS], in addition to the aforementioned arbitration remedy, shall be free to pursue all other legal remedies available to it under law, and shall be entitled to reimbursement of reasonable attorney's fees and other costs of collection." (Boldface & capitalization omitted.)

In the fall of 2022, the Bonzells received notification that they had "won" a multi-million-dollar prize and a new car in a sweepstakes. The announcement conditioned the Bonzells' receipt of the "prize" on the prepayment of taxes and other costs. Between December 2022 and February 2023, the Bonzells contacted RCS to request three transfers—totaling $1.2 million—from their retirement savings accounts to the Bonzells' checking account. RCS fulfilled those requests, and there is no evidence in the record that RCS questioned the Bonzells' withdrawals. Subsequently, the Bonzells discovered that the sweepstakes notification was fraudulent. RCS's facilitation of the Bonzells' withdrawal of $1.2 million from their retirement accounts precipitated the instant action.

B. *Procedural Background*

On April 29, 2024, the Bonzells filed their first amended complaint, alleging five causes of action against RCS: (1) elder financial abuse (Welf. & Inst. Code, § 15600 et seq.), (2) breach of fiduciary duty, (3) negligence, (4) breach of contract, and (5) declaratory relief. The Bonzells alleged that RCS's failures to impose a 15-day hold

---

**6** This appears to be an inadvertent and mistaken carryover from the 2010 IAA. The provision governing payment of RCS's fees was set forth in paragraph No. 2 of the 2010 IAA, but appears in paragraph No. 3 in the 2018 IAA.

and to obtain trusted contact information from the Bonzells, as well as its facilitation of the disbursement of $1.2 million from the Bonzells' accounts despite "those transfers [being] sudden, enormous and starkly out of character," caused the Bonzells' loss and breached RCS's fiduciary duties.

The Bonzells also brought a cause of action for declaratory relief in which they asserted that the arbitration provision in the 2018 IAA is unenforceable as procedurally and substantively unconscionable. They described the provision as unconscionable because the 2018 IAA was a contract of adhesion offered to the Bonzells on a "take it or leave it" basis, the Bonzells' signatures were obtained by undue influence, the arbitration provision was hidden within the 2018 IAA, and the arbitration provision does not specify which AAA rules apply. The Bonzells requested a declaration of the parties' respective rights and obligations under the 2018 IAA and the enforceability and applicability of its arbitration provision.[7]

On May 23, 2024, RCS filed a petition for an order compelling arbitration (petition). RCS asserted the existence of a signed agreement, the 2018 IAA, containing a binding arbitration provision that encompassed the five causes of action alleged in the Bonzells' first amended complaint. The Bonzells opposed the petition.

On July 1, 2024, the trial court issued a tentative ruling granting RCS's petition for arbitration and deciding that the arbitration provision was not procedurally unconscionable. The court noted that the evidence did not indicate that the Bonzells

---

[7] On May 3, 2024, the Bonzells filed a motion for trial preference pursuant to Code of Civil Procedure section 36, subdivision (a), which allows "[a] party to a civil action who is over 70 years of age [to] petition the court for a preference, which the court shall grant if the court" finds that "[t]he party has a substantial interest in the action as a whole" and "[t]he health of the party is such that a preference is necessary to prevent prejudicing the party's interest in the litigation." On July 19, 2024, the trial court issued an order granting the motion for trial preference, citing the Bonzells' age (89 years) and their "serious health issues, including declining memory."

7

either had questions about or requested revisions to the 2018 IAA, and the arbitration clause was clearly identified in the agreement.

On July 2, 2024, the trial court heard argument on RCS's petition. The Bonzells argued that the court's tentative ruling was incorrect for two reasons. First, the ruling failed to recognize that the 2018 IAA was a standardized agreement that was prepared by RCS and had no "substantive blanks" which the Bonzells could have used to modify it. They noted, pursuant to the California Supreme Court's decision in *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899 (*Sanchez*), that a complainant need not have demonstrated that they tried to negotiate a standardized agreement in order to demonstrate procedural unconscionability. Second, the Bonzells argued that the failure to reference the applicable AAA rules was prejudicial because the AAA publishes multiple sets of rules on their website, and it would have been unclear to the Bonzells which set of AAA rules applied to any arbitration between themselves and RCS.

RCS countered that the 2018 IAA is not a consumer contract because RCS specified as much in its moving papers and because it does not fall within one of the AAA's examples of consumer contracts, including "finance agreements for car loans, mortgages, [and] bank accounts." Therefore, by default, the AAA's Commercial Arbitration Rules would apply. When the trial court asked RCS how the Bonzells would have known that the 2018 IAA was not a consumer contract, RCS responded that the Bonzells would have known that information based on the fact that they "ha[d] the option to not sign the contract." RCS was not able to identify to the court any evidence in the record supporting its contention that the Bonzells knew the 2018 IAA was optional.

On July 8, 2024, the trial court issued an order denying RCS's petition on the grounds that the 2018 IAA's arbitration provision was procedurally and substantively unconscionable. As to procedural unconscionability, the court was "persuaded that the [2018] IAA was a contract of adhesion and that arguing the Bonzells could take their business to another vendor after working with RCS for so much time was not a real

8

choice." As to substantive unconscionability, the court cited the clause within the arbitration provision that allowed RCS "to seek redress in court for a client's failure to pay fees" (fee payment adjudication clause). The court rejected RCS's reliance on Civil Code section 1717 to deem the provision reciprocal. The court implicitly decided that statute was inapplicable and observed, "the fact remains that [RCS] can sue a client in court if the client fails to pay fees, but the client cannot sue [RCS] in court if the client does not believe it should pay [RCS] fees because of [RCS]'s breach." The court concluded that the fee payment adjudication clause was one-sided and found it rendered the arbitration provision substantively unconscionable.

On July 26, 2024, RCS appealed the trial court's July 8, 2024 order denying its petition. We ordered our decision in this matter expedited pursuant to Code of Civil Procedure section 1294.4, subdivision (a).[8]

## II. DISCUSSION

RCS contends that the trial court erred in denying its petition because the arbitration provision in the 2018 IAA was neither procedurally nor substantively unconscionable. With respect to procedural unconscionability, it asserts that the 2018 IAA was not a contract of adhesion because there was no evidence that the Bonzells were unable to negotiate the agreement. RCS further asserts that there was no evidence of oppression when the Bonzells signed the 2018 IAA because the record did not indicate that RCS set a time limit for the Bonzells to sign the agreement, pressured them to do so,

---

[8] Code of Civil Procedure section 1294.4, subdivision (a) states that, "in an appeal filed pursuant to subdivision (a) of [s]ection 1294 involving a claim under the Elder and Dependent Adult Civil Protection Act . . . in which a party has been granted a preference pursuant to [s]ection 36 of this code, the [C]ourt of [A]ppeal shall issue its decision no later than 100 days after the notice of appeal is filed." The Court of Appeal may grant an extension of time to issue its decision "only if good cause is shown and the extension will promote the interests of justice." (*Id.*, subd. (b).)

On October 8, 2024, this court found good cause to extend the time to file the opinion by 30 days due to delays caused by RCS's non-compliance with certain of the California Rules of Court and RCS's failure to timely file its opening and reply briefs.

9

or told them signing was mandatory. RCS maintains there is no evidence supporting the Bonzells' claim that they could not have moved their retirement funds to another financial advisor.

In addition, RCS argues that there was no evidence of surprise when the Bonzells signed the 2018 IAA because the agreement was neither long nor complex, its arbitration provision was clearly labeled, and, although the applicable AAA rules are neither identified nor attached to the agreement, the default rules are the publicly available AAA Commercial Arbitration Rules. With respect to substantive unconscionability, RCS maintains that Civil Code section 1717[9] preserves the Bonzells' rights despite the purportedly one-sided nature of the fee payment adjudication clause. RCS argues that the trial court should have severed the offending clause from the arbitration provision and enforced the remainder of the provision.

The Bonzells counter that the 2018 IAA was a contract of adhesion because it was "clearly a standardized contract," RCS had superior bargaining power and sent the agreement to all its clients, RCS did not inform the Bonzells that signing the agreement was optional, and the Bonzells had neither the power to negotiate the agreement nor "readily available alternatives" for investing their retirement funds. They argue that there is evidence of surprise because RCS presented the 2018 IAA to the Bonzells as part of a package with other preprinted forms and agreements (which contained different arbitration provisions that were governed by different arbitration rules), and the agreement failed to identify which set of AAA rules would apply.

---

[9] The language RCS relies on states: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).)

10

The Bonzells further assert that there is evidence of oppression due to the timing of the presentation of the 2018 IAA—the Bonzells received and signed the 2018 IAA while advanced in age and after having established a long and trusted relationship with RCS, which both resulted in placing "implicit[] pressure[]" on the Bonzells to sign the agreement and made it difficult, from a practical perspective, for the Bonzells to leave RCS and establish a relationship with another investment advisor. With respect to substantive unconscionability, while the Bonzells acknowledge that "a contract can provide the party with superior bargaining strength extra protection," they contend that neither the 2018 IAA nor RCS offered any rationale for the nonmutual right to bring a cause of action with respect to fees owed to RCS under the agreement. Moreover, they maintain that their waiver of rights under paragraph No. 7 of the 2018 IAA, which would "effectively extinguish the Bonzells' statutory rights under the Elder Abuse and Dependent Adult Civil Protection Act," and the application of limited discovery rules pursuant to the AAA's Commercial Arbitration Rules likewise support a determination that the arbitration provision is substantively unconscionable.[10] The Bonzells argue that RCS forfeited its severability argument by failing to raise it in the trial court.

In reply, RCS argues that the Bonzells failed to support the following assertions with evidence in the record: the Bonzells' cognitive decline in 2018 and their intentions when they signed the 2018 IAA; that the 2018 IAA was presented to them in a "take it or leave it" manner; and that the applicable AAA rules were not provided to them in conjunction with the 2018 IAA.

---

[10] The Bonzells also argue that the 2018 IAA was not a valid agreement because they did not knowingly consent to arbitration and only signed the agreement under duress and as the result of RCS exerting undue influence on the Bonzells. Because we conclude that the 2018 IAA's arbitration provision is unconscionable based on other factors, we do not address the Bonzells' arguments regarding the impact of the liability waiver in the 2018 IAA or the validity of the agreement. We discuss the AAA rules *post* (pt. II.C.1., fns. 17 &18).

11

*A. Applicable Law*

"Both California and federal law strongly favor arbitration." (*Prima Donna Development Corp. v. Wells Fargo Bank, N.A.* (2019) 42 Cal.App.5th 22, 35 (*Prima Donna*).) "Thus, under both federal and California law, arbitration agreements are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. (9 U.S.C. § 2; see also, Code Civ. Proc., § 1281.) In other words, under California law, as under federal law, an arbitration agreement may only be invalidated for the same reasons as other contracts." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 98, fn. omitted (*Armendariz*).) " ' "[G]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening" the [Federal Arbitration Act]' or California law." (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125 (*OTO*); *Armendariz*, at p. 127 ["In this respect, arbitration agreements are neither favored nor disfavored, but simply placed on an equal footing with other contracts."].)

"The party seeking to compel arbitration bears the burden of proving that an arbitration agreement exists. The opposing party then must prove any defense to enforcement of the arbitration agreement." (*Crippen v. Central Valley RV Outlet* (2004) 124 Cal.App.4th 1159, 1164 (*Crippen*).)

When a party claims that an arbitration agreement or provision is unenforceable due to its unconscionability, a court must determine whether the agreement or provision[11] "was unconscionable at the time it was made." (*Prima Donna*, *supra*, 42 Cal.App.5th at p. 37; *Sanchez*, *supra*, 61 Cal.4th at p. 920.) "A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party." (*OTO*, *supra*, 8 Cal.5th at

---

[11] "Courts may find a contract as a whole 'or any clause of the contract' to be unconscionable." (*Sanchez*, *supra*, 61 Cal.4th at p. 910, citing Civ. Code, § 1670.5, subd. (a).)

12

p. 125.)  Thus, " '[t]he unconscionability doctrine " 'has both a procedural and a substantive element.' " ' " (*Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 67 (*Swain*).)

" 'The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power.' " (*OTO*, *supra*, 8 Cal.5th at p. 125.)  " ' " 'Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form.' " ' " (*Id*. at p. 126, italics omitted.) Courts have also found oppression or surprise when an arbitration agreement or provision has not identified the applicable rules governing arbitration.  (*Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 245 ["The level of oppression is increased when, as here, the employer not only fails to provide a copy of the governing rules, but also fails to clearly identify which rules will govern so the employee could locate and review them."]; *Carlson v. Home Team Pest Defense, Inc.* (2015) 239 Cal.App.4th 619, 633 [finding failure to disclose the applicable arbitration rules constituted surprise].)

Substantive unconscionability, on the other hand, " 'pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.' " (*OTO*, *supra*, 8 Cal.5th at p. 125; *Swain*, *supra*, 57 Cal.App.5th at p. 67.)  "This analysis 'ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as " ' "overly harsh" ' " [citation], " 'unduly oppressive' " [citation], " 'so one-sided as to "shock the conscience" ' " [citation], or "unfairly one-sided" [citation].  All of these formulations point to the central idea that the unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain" [citation], but with terms that are "unreasonably favorable to the more powerful party." ' " (*OTO*, at pp. 129–130; *Prima Donna*, *supra*, 42 Cal.App.5th at p. 38.)  Such terms include " ' "provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price

13

or other central aspects of the transaction." ' " (*Sanchez*, *supra*, 61 Cal.4th at p. 911.) "These examples are illustrative, not exhaustive." (*OTO*, at p. 130.)

Our courts have cautioned that "[a] party cannot avoid a contractual obligation merely by complaining that the deal, in retrospect, was unfair or a bad bargain. Not all one-sided contract provisions are unconscionable; hence the various intensifiers in our formulations: '*overly* harsh,' '*unduly* oppressive,' '*unreasonably* favorable.' " (*Sanchez*, *supra*, 61 Cal.4th at p. 911; *Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1245 (*Baltazar*).) As our Supreme Court has recognized, " ' "a contract can provide a 'margin of safety' that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable." ' " (*Sanchez*, at p. 912; *Baltazar*, at p. 1250.) However, the stronger party must identify the " 'legitimate commercial need' " for such a one-sided provision either in the contract itself or in extrinsic evidence. (*Armendariz*, *supra*, 24 Cal.4th at p. 117; *id.* at pp. 117–118 [" ' "[U]nconscionability turns not only on a 'one-sided' result, but also on an absence of 'justification' for it." ' "].)

"Both procedural and substantive unconscionability must be shown for the defense to be established, but 'they need not be present in the same degree.' [Citation.] Instead, they are evaluated on ' "a sliding scale." ' " (*OTO*, *supra*, 8 Cal.5th at p. 125.) "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable." (*Armendariz*, *supra*, 24 Cal.4th at p. 114.) "Conversely, the more deceptive or coercive the bargaining tactics employed, the less substantive unfairness is required." (*OTO*, at pp. 125–126.)

*B. Standard of Review*

" 'Whether an agreement is unconscionable presents a question of law which we review de novo.' " (*Swain*, *supra*, 57 Cal.App.5th at p. 66.)

14

However, "the unconscionability defense . . . is inherently fact specific" (*OTO*, *supra*, 8 Cal.5th at p. 138; *Prima Donna*, *supra*, 42 Cal.App.5th at p. 37) and "is highly dependent on context." (*Sanchez*, *supra*, 61 Cal.4th at p. 911; *OTO*, at p. 125.) Where, as is the case here, " ' "the trial court's determination that the arbitration agreement was unconscionable turned on the resolution of conflicts in the evidence or on factual inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's ruling and review the trial court's factual determinations under the substantial evidence standard." ' " (*Swain*, *supra*, 57 Cal.App.5th at p. 66; *id*. at p. 70 ["[W]e defer to the trial court's resolution of any factual dispute over the circumstances in which [the party opposing arbitration] signed the arbitration agreement."]; *Gamma Eta Chapter of Pi Kappa Alpha v. Helvey* (2020) 44 Cal.App.5th 1090, 1097.) "When the trial court makes no express findings, we infer that it made every implied factual finding necessary to support its order and [we] review those implied findings for substantial evidence." (*Chin v. Advanced Fresh Concepts Franchise Corp.* (2011) 194 Cal.App.4th 704, 708; *Parada v. Superior Court* (2009) 176 Cal.App.4th 1554, 1567.)

### C. Analysis

#### 1. Procedural Unconscionability

"A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.' [Citation.] An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*OTO*, *supra*, 8 Cal.5th at p. 126.) Such adhesive contracts, " 'although they are indispensable facts of modern life that are generally enforced [citation], contain a degree of procedural unconscionability even without any notable surprises, and "bear within them the clear danger of oppression and overreaching." ' " (*Baltazar*, *supra*, 62 Cal.4th at p. 1244; *Swain*, *supra*, 57 Cal.App.5th at p. 66.)

15

The Bonzells cite to the 2018 IAA itself for support that the agreement "is clearly a standardized contract – a pre-printed form with [RCS]'s name in the preprinted substance and the Bonzells' names and address typed on a blank line." RCS concedes that the 2018 IAA is "a pre-printed form prepared by RCS."

We agree. The 2018 IAA is essentially a preprinted form. It contains only the following options for the client to complete: the date of the agreement, a selection between two options for services sought from RCS, the payment schedule for RCS's services, an initial block for the client to acknowledge that RCS's "[f]ees are generally negotiable in [RCS's] sole discretion," and the signature blocks. In addition, RCS acknowledges that the 2018 IAA was mailed to "all existing advisory clients" and contains the "exact same" arbitration provision as the one in the 2010 IAA, also prepared by RCS. Therefore, we determine that the 2018 IAA is a standardized, preprinted form agreement.

Although RCS disputes the Bonzells' arguments that they "had no bargaining power and could not negotiate the contract," RCS fails to support its assertion that it was not the party with the greater bargaining power. Both parties agree that RCS drafted the 2018 IAA. From that fact, in the absence of countervailing evidence, we can infer RCS had the superior bargaining position. (*A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 486 ["Characteristically, the form contract is drafted by the party with the superior bargaining position."]; see also *Armendariz*, *supra*, 24 Cal.4th at p. 113.) We determine that, as the drafter of the 2018 IAA and in the absence of contrary evidence in the record, RCS was "the party with superior bargaining power." (*OTO*, *supra*, 8 Cal.5th at p. 126.)

RCS's contention that the 2018 IAA is not an adhesive contract centers on its argument that it did not offer the agreement to the Bonzells on a " 'take-it-or-leave-it' basis" because it was neither mandatory for the Bonzells to sign it nor did the Bonzells lack the opportunity to negotiate the agreement.

16

We are unpersuaded by RCS's assertion that the 2018 IAA was not "mandatory." It is pursuant to the investment advisory agreement that clients obtain financial, retirement planning, and/or investment advisory services from RCS. If the Bonzells wanted to work with or continue working with RCS as their investment advisor, they would have needed to sign an investment advisory agreement to obtain or retain RCS's services.[12] If the Bonzells elected not to sign an investment advisory agreement, they would have been required to find a different investment advisor to manage their retirement accounts. Indeed, RCS repeatedly maintains that the Bonzells could have "mov[ed] to another investment advisory firm to achieve their desired terms," suggesting that the Bonzells could "take it or leave it" if they did not agree with the terms of the 2018 IAA.

The 2018 IAA does not state or suggest that either the agreement as a whole or its arbitration provision are negotiable. While RCS counters that nothing in the record suggests that the Bonzells "could not negotiate" the 2018 IAA,[13] the agreement indicates only that RCS's fees may be negotiable at RCS's discretion. It does not suggest that any other provisions, including the arbitration provision, are negotiable. Indeed, the

---

[12] RCS contends that the transition "from LPL [Financial LLC] to TD Ameritrade . . . was [] optional" and "some clients [] decided to stay with LPL [Financial LLC]," to support its argument that signing the 2018 IAA was optional. However, the 2018 IAA is not a TD Ameritrade form. Rather, the 2018 IAA governs the investment management relationship between RCS and its clients. Whether the transition from LPL Financial LLC to TD Ameritrade was optional for RCS's clients does not bear on whether clients needed to sign the 2018 IAA to obtain or retain RCS's advisory services.

[13] RCS argues that the Bonzells' meeting with RCS in May 2018 is evidence of the Bonzells' ability to ask questions about and negotiate the 2018 IAA. Given that the referenced meeting took place before RCS mailed the 2018 IAA to its clients (including the Bonzells) in June 2018, as RCS acknowledges, and the May 2018 meeting notes make no mention of the parties discussing the 2018 IAA, we are not persuaded. Moreover, "in the context of consumer contracts, we have never required, as a prerequisite to finding procedural unconscionability, that the complaining party show it tried to negotiate standardized contract provisions." (*Sanchez*, *supra*, 61 Cal.4th at p. 914.)

limitedreference to negotiability in paragraph No. 3 suggests that the remainder of the 2018 IAA was not negotiable.

Because the Bonzells would have had to execute an investment advisory agreement with RCS to obtain or retain RCS's services and the language of the 2018 IAA suggests that the arbitration provision is not negotiable, we determine substantial evidence in the record supports the trial court's factual conclusion that RCS offered the 2018 IAA to the Bonzells on a " 'take-it-or-leave-it' basis."

Considering all the elements of adhesion, we conclude that the 2018 IAA was a contract of adhesion. As a contract of adhesion, the 2018 IAA necessarily " ' "contain[ed] a degree of procedural unconscionability." ' " (*Baltazar*, *supra*, 62 Cal.4th at p. 1244; *Swain*, *supra*, 57 Cal.App.5th at p. 68.)

We turn to whether the circumstances under which the Bonzells executed the 2018 IAA were oppressive. "Where the parties to a contract have unequal bargaining power and the contract is not the result of real negotiation or meaningful choice, it is oppressive." (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 87 (*Gutierrez*).)

RCS asserts that the 2018 IAA is not oppressive based on the following factors: " '(1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney.' "[14] (*OTO*, *supra*, 8 Cal.5th at pp. 126–127.) We agree with RCS that there is no evidence that RCS imposed a time limit on the Bonzells to sign the agreement and that the arbitration provision in the six-

---

[14] We note that this list is nonexhaustive and we also consider whether the contract " ' " 'involves lack of negotiation and meaningful choice.' " ' " (*OTO*, *supra*, 8 Cal.5th at p. 126.)

page 2018 IAA is clearly labeled. The record is silent on whether the Bonzells consulted with an attorney when reviewing the 2018 IAA.

However, we are not persuaded by RCS's argument that the Bonzells faced "no pressure" to sign the agreement. The Bonzells were required to sign an investment advisory agreement if they wanted to retain RCS's investment advisory services and, on its terms, the 2018 IAA does not appear to be negotiable except for RCS's fees. Having found a degree of oppression in the lack of negotiability of the 2018 IAA, we consider whether there was further evidence of oppression by reviewing whether the Bonzells had any " ' " 'meaningful choice' " ' " to move their accounts to other investment advisors. (*OTO*, *supra*, 8 Cal.5th at p. 126.)

RCS argues that the Bonzells failed to provide "any adequate explanation as to why moving to another investment firm was not an option." RCS contends that there are other investment advisory firms with whom the Bonzells could have contracted. It further maintains that there was no pressure on the Bonzells to remain with RCS because the Bonzells were not contracting for the provision of "life's necessit[i]es." RCS argues that, although a contract pertaining to the Bonzells' "retirement savings is clearly important, it is akin to a business venture and does not present the same type of immediate pressure that a contract for medical services would."

Although RCS cites *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758 to support its argument that "the existence of reasonably available market alternatives defeats a claim of adhesiveness" (*id*. at p. 769), the court in that case limited its holding, stating that it "do[es] not hold or suggest . . . that *any* showing of competition in the marketplace as to the desired goods and services defeats, as a matter of law, *any* claim of unconscionability. Rather [the court held] that the 'oppression' factor of the procedural element of unconscionability may be defeated, if the complaining party has a meaningful choice of reasonably available alternative sources of supply from which to obtain the desired goods and services free of the terms claimed to be unconscionable."

19

(*Id*. at p. 772.) Later decisions by our Courts of Appeal and our Supreme Court have reemphasized this limitation by stating that the availability of alternatives does not, by itself, defeat a claim of unconscionability. (E.g., *Armendariz*, *supra*, 24 Cal.4th at p. 113; *Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, 1100 (*Szetela*) [noting that the availability of substitute goods was not "the relevant test for unconscionability"].)

In addition, "[w]hile the 'nonessential nature' of the goods or services in a contract [citation] and '[t]he availability of similar goods or services elsewhere' [citation] are relevant to evaluating whether an arbitration agreement is unconscionable, they do not negate the procedural unconscionability of an otherwise adhesive contract." (*Swain*, *supra*, 57 Cal.App.5th at pp. 70–71; *Szetela*, *supra*, 97 Cal.App.4th at p. 1100 [" '[A] contract might be adhesive even if the weaker party could reject the terms and go elsewhere.' "].)

Our Courts of Appeal have evaluated the procedural unconscionability of an arbitration agreement or provision within the context of the goods and/or services covered by the applicable agreement. For example, they have distinguished employment contracts from contracts for consumer goods, such as vehicles, noting that "in the employment context, 'jobseekers are more likely to face "particularly acute" economic pressure to sign an employment contract with a predispute arbitration provision.' " (*Sanchez*, *supra*, 61 Cal.4th at p. 919.) " 'A family in search of a job confronts a very different set of burdens than one seeking a new vehicle. Consumers, who face significantly less economic pressure[,] would seem to require measurably less protection.' " (*Id*. at pp. 919–920.) RCS argues that the Bonzells' retirement savings are not among "life's necessit[i]es."

In our view, management services for retirement savings are more akin to an employee's salary than to a consumer product like a vehicle. (See *Sanchez*, *supra*, 61 Cal.4th at pp. 919–920.) The Bonzells' retirement savings represent the accumulation of funds from their earnings over the course of their working lives, accrued for the purpose

20

of supporting their remaining nonworking years, including providing for the necessities thereof, when they are no longer able to reliably generate income. " ' "[P]articularly acute" economic pressure' " (*id.* at p. 919) would reasonably attach to the need to preserve their retirement savings. Such economic pressure may be further heightened given their successful and lengthy relationship with, trust in, and reliance on RCS in RCS's capacity as financial, retirement planning, and investment advisors helping them to maintain and grow their retirement savings. (See, e.g., *OTO*, *supra*, 8 Cal.5th at p. 127 ["Employees who have worked in a job for a substantial length of time have likely come to rely on the benefits of employment."].) At the time they signed the 2018 IAA, the Bonzells were already 83 years old and had entrusted their retirement savings to RCS for almost three decades. Developing trust with a new financial advisor after almost 30 years with RCS would take time and the Bonzells, being retired octogenarians, would not be able to easily regenerate their retirement funds in the event of mismanagement by another financial advisor. We conclude the Bonzells did not have "meaningful choice" with respect to financial advisors and decide there was a degree of oppression in this absence demonstrative of procedural unconscionability. (*Gutierrez*, *supra*, 114 Cal.App.4th at p. 87.)

Turning to the factor of surprise in the procedural unconscionability analysis, we agree with RCS that the arbitration provision is not difficult to locate in the 2018 IAA. The 2018 IAA is six pages long and the arbitration provision is clearly set apart and comprises four sentences or 10 lines of text.[15]

---

[15] RCS argues that the Bonzells cannot contend they were surprised by the terms of the 2018 IAA because, by signing the agreement, the Bonzells "acknowledged that they had carefully read its terms." However, there is no "rule that if a party reads an agreement he or she is barred from claiming it is unconscionable. Such a rule would seriously undermine the unconscionability defense." (*Higgins v. Superior Court* (2006) 140 Cal.App.4th 1238, 1251; *Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1289 ["A contract term may be held to be unconscionable even if the weaker party knowingly agreed to it."].)

Nevertheless, we decide that RCS's failure to either identify or append the applicable AAA rules created procedural unconscionability based on surprise. The parties do not contest that the AAA has multiple sets of rules that vary depending on the nature of the agreement and/or the proceedings. The 2018 IAA's arbitration provision states that arbitration will be conducted "in accordance with the auspices and rules of the American Arbitration Association ('AAA')" but does not identify which of the AAA's rules would apply to a dispute arising out of the agreement. Neither the copy of the 2018 IAA provided by the Bonzells nor the copy provided by RCS attaches the applicable AAA rules. The failure to disclose the applicable AAA rules omits key terms of the arbitration provision.

RCS contends both that (1) the AAA Consumer Arbitration Rules would not apply here because the 2018 IAA is not a consumer contract, and (2) when the applicable AAA rules are not identified in an arbitration agreement or provision, the default rules are the AAA's Commercial Arbitration Rules, which are available on the Internet. In response to RCS's first contention, the trial court asked RCS how the Bonzells were to know that the 2018 IAA was not a consumer contract in order to determine that the AAA Consumer Arbitration Rules were not applicable. RCS responded that the Bonzells should have known the 2018 IAA was not a consumer contract because "they ha[d] the option to not sign the contract." But RCS was unable to identify any evidence in the record supporting this assertion.

It is unclear how laypersons such as the Bonzells, educated as they may be, could have navigated and analyzed the various AAA rules to understand whether the 2018 IAA was a consumer contract,[16] which set of rules would apply, and that, in certain

---

[16] Based on the definition of consumer contracts in the AAA's Consumer Arbitration Rules, it appears that the 2018 IAA may qualify as a consumer contract. The AAA Consumer Arbitration Rules state that they will apply whenever the parties "have provided for arbitration by the American Arbitration Association [], and [¶] 1) have specified that these Consumer Arbitration Rules shall apply; [¶] . . . [¶] [or] 3) the

22

circumstances, the AAA's Commercial Arbitration Rules would apply by default.[17]  In light of the foregoing, the Bonzells' "signature[s] attesting to have read and understood the agreement appear[] formulaic rather than informed" (*OTO*, *supra*, 8 Cal.5th at p. 129) and do not negate a finding of surprise.

RCS counters that "[i]t is unclear how failing to advise the [Bonzells] that the IAA is *not* a consumer contract and they would *not* be subject to a certain set of arbitration

---

arbitration agreement is contained within a consumer agreement, as defined below, that does not specify a particular set of rules." (Italics omitted.)  "The AAA defines a consumer agreement as an agreement between an individual consumer and a business where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices.  The product or service must be for personal or household use."

As discussed in greater detail *ante* (pt. II.C.1.), the 2018 IAA is a preprinted, standardized form agreement, RCS sends the same agreement with the same arbitration provision to all its customers, and the agreement is primarily nonnegotiable (except, to a limited extent, for RCS's fees, the negotiation of which is subject to RCS's sole discretion).  The services in question are financial and retirement planning and investment management services specifically for the individual client(s) who sign the agreement, here, the Bonzells.  An agreement for such services falls squarely within one of the enumerated examples provided by the AAA of consumer contracts:  "[f]inance agreements (car loans, mortgages, bank accounts)."  We are not persuaded by RCS's conclusory statement to the contrary.

The 2018 IAA does not clearly fall within one of the AAA's proffered examples of agreements falling outside the scope of "consumer contracts":  "[h]ome construction and remodeling contracts," "[r]eal estate purchase and sale agreements," "[c]ondominium or homeowner association by-laws," "[b]usiness insurance policies (including crop insurance)," "[c]ommercial loan and lease agreements," and "[c]ommercial guaranty agreements."

[17] The AAA's Commercial Arbitration Rules state that parties to an arbitration agreement or provision "shall be deemed to have made these [r]ules a part of their arbitration agreement [or provision] whenever they have provided for arbitration by the American Arbitration Association ('AAA') under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules."  As discussed in greater detail *ante* (fn. 17), the 2018 IAA appears to be a consumer contract.  The AAA Commercial Arbitration Rules provide that they only apply in the event of a commercial dispute.

rules is unconscionable. There is no caselaw which concludes that failing to advise [the Bonzells] that they are *not* subject to more restrictive arbitration rules than those they are actually subject to is evidence of procedural unconscionability." We are not persuaded by RCS's argument, which ignores settled case law stating that the failure to identify the applicable arbitration rules supports a finding of procedural unconscionability on the basis of surprise. (*Crippen*, *supra*, 124 Cal.App.4th at p. 1167 [finding surprise where "the agreement did not say whether the Better Business Bureau rules in effect at the time of signing or the time of arbitration would control," leading the customer to "blindly sign[] on to a costly preliminary dispute over what rules would apply if there was a conflict"]; *Haydon*, *supra*, 97 Cal.App.5th at p. 1288 [stating that "defendants' failure to alert [the plaintiff] to relevant provisions of the JAMS rules, such as [] discovery limitations . . ., is another factor supporting the trial court's finding of unconscionability based on surprise"]; cf. *Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676, 692 [noting failure to attach the applicable arbitration rules could support finding of surprise, but determining no surprise where "the arbitration agreement at issue clearly specified a particular set of AAA rules"].)

Thus, we determine the 2018 IAA arbitration provision was procedurally unconscionable based on surprise due to RCS's failure to identify the applicable AAA rules in the 2018 IAA or append a copy of such rules to the agreement.

Considering the adhesive nature of the 2018 IAA, the implicit oppression arising from the circumstances surrounding the Bonzells' execution of the agreement, and surprise stemming from RCS's failure to identify or attach the applicable AAA rules to the agreement, we determine that the 2018 IAA arbitration provision is procedurally unconscionable. Having made that determination, we turn to the question of substantive unconscionability.

24

2. <u>Substantive Unconscionability</u>

" 'Substantive unconscionability examines the fairness of a contract's terms.' " (*Swain*, *supra*, 57 Cal.App.5th at p. 71; *Prima Donna*, *supra*, 42 Cal.App.5th at p. 38; *OTO*, *supra*, 8 Cal.5th at p. 129.) "[A] one-sided provision in favor of the stronger party imposing an adhesive arbitration agreement on a weaker party is a hallmark of substantive unconscionability." (*Swain*, at p. 73.)

The clause at issue here exempts from arbitration the adjudication of disputes over the fees owed to RCS for performance of the contracted services. It states, "Client acknowledges and agrees that in the specific event of non-payment of any portion of [RCS's fees] pursuant to paragraph [3] of this [a]greement, [RCS], in addition to the aforementioned arbitration remedy, shall be free to pursue all other legal remedies available to it under law, and shall be entitled to reimbursement of reasonable attorney's fees and other costs of collection." (Boldface & italics omitted.)

The fee payment adjudication clause "is unfairly one-sided because it compels arbitration of the claims more likely to be brought by . . . the weaker party." (*Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 725.) The agreement requires arbitration of claims mostly likely to be brought by the weaker party, the Bonzells—namely, "any dispute pertaining to [RCS's] services" under the 2018 IAA—"but exempts from arbitration the types of claims that are more likely to be brought by . . . the stronger party" (*ibid*.), RCS—namely, claims relating to the failure to pay RCS its fees.

RCS argues that, despite the one-sided nature of the fee payment adjudication clause,[18] the Bonzells retain their rights to attorney fees pursuant to Civil Code section

---

[18] Although RCS concedes that the fee payment adjudication clause in question is one-sided, it argues that the clause does not " 'shock the conscience,' " and, thus, must not be substantively unconscionable. Despite RCS's reliance on this permutation of the standard, our Supreme Court has observed and reaffirmed that " 'an examination of the case law does not indicate that "shock the conscience" is a different standard in practice than other formulations [(e.g., overly harsh, unduly oppressive, and unfairly one-sided)] or that it is the one true, authoritative standard for substantive unconscionability,

1717. This argument is misplaced. Civil Code section 1717 does not apply because, according to the plain language of the statute, it pertains only to the award of attorney fees. (*Id.*, subd. (a); *Trope v. Katz* (1995) 11 Cal.4th 274, 285; see also *Musaelian v. Adams* (2009) 45 Cal.4th 512, 517 ["The ordinary and usual meaning of 'attorney's fees,' in both legal and general usage, is the consideration a litigant actually pays or becomes liable to pay in exchange for legal representation."].) RCS's fees for its performance of the financial services set forth in the 2018 IAA do not fall within the purview of Civil Code section 1717.

Although we recognize that " ' "a contract can provide a 'margin of safety' that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable" ' " (*Sanchez*, *supra*, 61 Cal.4th at p. 912), without the stated justification, the clause, provision, or agreement, may be found substantively unconscionable. (*Armendariz*, *supra*, 24 Cal.4th at p. 120; *O'Hare v. Municipal Resource Consultants* (2003) 107 Cal.App.4th 267, 277 (*O'Hare*).) The " ' "business realities" ' " (*Armendariz*, at p. 117) creating the " ' "legitimate commercial need" ' " (*Sanchez*, at p. 912; *Baltazar*, *supra*, 62 Cal.4th at p. 1250) may be " 'explained in the contract itself,' " otherwise " 'it must be factually established.' " (*Armendariz*, at p. 117.)

The 2018 IAA does not set forth a rationale for the one-sided fee payment adjudication clause, either in the arbitration provision itself or elsewhere in the agreement. Nor does the record, including RCS's briefing in the trial court and on appeal, include any explanation for the one-sided clause. "Without such justification, we must assume that" the agreement is substantively unconscionable, and we do so here. (*Armendariz*, *supra*, 24 Cal.4th at p. 120; *O'Hare*, *supra*, 107 Cal.App.4th at p. 277.)

exclusive of all others.' [Citation.] Nor do we see any conceptual difference among these formulations." (*Sanchez*, *supra*, 61 Cal.4th at p. 911; *Baltazar*, *supra*, 62 Cal.4th at p. 1245.)

### 3. Severability

"When unconscionability is shown, the trial court has discretion to 'refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.' " (*Haydon*, *supra*, 97 Cal.App.5th at p. 1292; Civ. Code, § 1670.5, subd. (a).) We review a trial court's decision whether to sever the unconscionable clause or clauses for an abuse of discretion. (*Haydon*, at p. 1292; *Dougherty v. Roseville Heritage Partners* (2020) 47 Cal.App.5th 93, 102.)

RCS argues for the first time on appeal that the trial court should have severed the unconscionable portions of the arbitration provision and preserved its right to arbitration under the 2018 IAA. Arguments not presented in the trial court are forfeited on appeal. (*People v. Oneal* (2021) 64 Cal.App.5th 581, 592, fn. 6.)

Even if RCS had preserved this argument for appeal, it has not demonstrated that the trial court abused its discretion by declining to sever the unconscionable portions of the arbitration provision. RCS maintains that the trial court found "only one sentence in the arbitration provision . . . to be substantively unconscionable," the fee payment adjudication clause, and argues that that single sentence can be severed to preserve the arbitration provision.

However, the trial court found the arbitration provision to be both procedurally and substantively unconscionable. Among the factors it considered in reaching that conclusion was RCS's failure to identify the applicable AAA rules. When an agreement or provision has multiple defects—here, the procedurally unconscionable clause regarding the AAA rules and the substantively unconscionable clause regarding RCS's one-sided right to bring a cause of action for breach of the payment provision of the 2018 IAA—it "indicate[s] a systematic effort to impose arbitration . . . not simply as an alternative to litigation, but as an inferior forum that works to the [drafter's] advantage." (*Armendariz*, *supra*, 24 Cal.4th at p. 124.) Moreover, if "there is no single provision a

27

court can strike or restrict in order to remove the unconscionable taint from" the provision (*id.* at pp. 124–125), the court would have to "reform the [provision], not through severance or restriction, but by augmenting it with additional terms," which courts do not have the power to do (*id.* at p. 125). We conclude that the trial court did not abuse its discretion by not severing the offending clauses.

## III.  DISPOSITION

The judgment is affirmed. Pursuant to the parties' stipulation and California Rules of Court, rule 8.272(c)(1), the court directs immediate issuance of the remittitur. Respondents are awarded costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____
Danner, J.

WE CONCUR:



_____
Greenwood, P. J.




_____
Grover, J.




**H052392**
*Bonzell et al. v. Retirement Capital Strategies, Inc.*